**Helen STEWART, Plaintiff,**

**v.**

**WEIS MARKETS, INC., Defendant.**

**No. 4:CV–92–0539.**

United States District Court,
M.D. Pennsylvania.

June 30, 1995.

Michael J. Zicolello, Marshall, Dennehy, Warner, Coleman & Goggin, Williamsport, PA, for plaintiff.

Joe C. Ashworth, Douglas G. Smith, Pittsburgh, PA, for defendant.

*MEMORANDUM*

McCLURE, District Judge.

## BACKGROUND

Plaintiff Helen Stewart filed this employment discrimination action against her former employer, Weis Markets,[1] Inc. (Weis Markets) for alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) and the Pennsylvania Human Relations Act, 43 P.S. § 955 *et seq.* (PHRA).[2]

Plaintiff alleges that she was subjected to a sexually hostile working environment in the produce department at Weis Markets' Lycoming Creek store in Williamsport, Pennsylvania, which resulted in her constructive discharge on September 21, 1990.

This case was tried to a jury, which awarded plaintiff $139,125.00 as compensatory damages against Weis Markets for the harassment which she endured while in its employ. The parties stipulated that if a liability verdict was returned on plaintiff's claim of constructive discharge, plaintiff was entitled to receive damages of $5,790.40 as back pay.

Plaintiff was granted the right to a jury trial under this court's ruling that the Civil Rights Act of 1991 would be applied retroactively to claims which accrued prior to its November 21, 1991 effective date. That ruling turned out to be erroneous. Subsequent to the rendering of the jury verdict in this case and while post-trial motions were pending, the United States Supreme Court ruled in *Landgraf v. USI Film Production,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), that the 1991 Amendments to the Civil Rights Act of 1964 are not retroactive. Plaintiff was, therefore, not entitled to a jury trial on her Title VII claims. There was never any serious question about the fact that she had no right to demand a jury trial for the claims asserted under the PHRA.

Although the non-retroactivity of the 1991 Act precludes plaintiff from recovering compensatory damages under Title VII for the harassment she endured while employed at Weis Markets, she has the right to recover compensatory damages for such conduct under the PHRA.

In a telephone conference call with counsel, both sides declined this court's offer to re-assign this matter to another judge in view of this court's participation in pre-trial discussions and both agreed that the case should be decided by the undersigned judge on the existing record. Pursuant to that agreement, we now enter the following findings of fact and conclusions of law based upon the evidence presented at the jury trial. The court will consider the verdict rendered by the jury to be an advisory verdict pursuant to Fed.R.Civ.P. 39(c).

For the reasons which follow, the court finds that: 1) plaintiff has established that she was subjected to a sexually hostile environment during her entire period of employment with Weis Markets as a result of the harassing conduct and abusive language of a sexual nature of her immediate supervisor, Thomas Botsford; 2) that supervisory level

---

1. Plaintiff's former supervisor, Thomas Botsford was originally named a defendant as well, but was dismissed from the case at the close of all evidence at trial, on the ground that only employers or supervisory level personnel are amenable to suit under Title VII or the PHRA.

2. Plaintiff also filed a state tort claim for intentional infliction of emotional distress. That claim was dismissed at trial at the close of plaintiff's case pursuant to Weis Markets' motion under Fed.R.Civ.P. 50, as was her claim for punitive damages.

employees of Weis Markets, in particular, the general manager of the store where plaintiff was employed, were aware or reasonably should have been aware of such harassment, but took no remedial action; 3) although supervisory employees of Weis, in particular, District Produce Supervisor James Shaffer, did take immediate action when the harassment was brought to their attention, his acts, admittedly effective, do not expunge liability for the months that the store manager knew or reasonably should have known of the harassment but took no action to ameliorate the same; 4) plaintiff was not constructively discharged from her position with Weis Markets, and is not, therefore, entitled to recover back pay.

## FINDINGS OF FACT

1. Weis Markets is a retail supermarket chain, with stores in several mid-Atlantic states including three stores in Williamsport, Pennsylvania.

2. Helen Stewart was hired by defendant Weis Markets on September 2, 1988 as a part-time salad bar clerk at Weis Markets' Lycoming Creek Road facility in Williamsport, Pennsylvania.

3. Stewart successfully completed her probationary period, and was placed in charge of the salad bar. Her duties included interviewing prospective salad bar clerks, coordinating the schedule for the salad bar workers, training new salad bar clerks, and insuring that the salad bar was sufficiently stocked.

4. Her work was satisfactory to Weis Markets and she received periodic pay increases. She had aspirations of becoming a full-time employee of Weis Markets.

5. Stewart was not advised at the time of her hiring of the existence of any company policy prohibiting sexual harassment of employees.

6. When she was hired, Stewart signed a personnel orientation form. That form contained no reference to any sexual harassment policy of Weis Markets.

7. During her employment with Weis Markets, Stewart received no written reprimands, and her personnel file contained no written documentation of performance problems or any recommendation by defendant Weis Markets regarding disciplinary action.

8. Thomas Botsford was manager of the produce department at Weis Markets' Lycoming Creek store and was plaintiff's immediate supervisor.

9. During much of her employment with Weis Markets, Stewart was subjected to pervasive verbal harassment of a sexual nature on a regular basis by Botsford.

10. Botsford routinely addressed comments to her with the epithets: "sleazebag," "douchebag," and "bitch." He would also frequently ask her if she "got any last night," would tell her to "bend over, Helen Baby," and would state "while you're down there," to Stewart while flipping up his work apron as a suggestion of oral sex. He also suggested that Stewart must like young men, and told a co-worker to take her into the cooler and "take care of her." After an elderly lady customer complimented Stewart on her work by stating, "You are very good," Botsford stated to the customer, "How do you know, have you ever had her?"

11. He addressed similar comments to other female employees under his supervision.

12. Stewart let Botsford know that his harassing comments were unwelcome.

13. Her efforts to change his behavior had no effect and the harassment continued.

14. Other employees who worked in the produce department at Weis Markets' Lycoming Creek Road store overheard Botsford's sexual harassment of Helen Stewart and other female employees under his supervision.

15. On-site store supervisory personnel, specifically store manager Dean Meyer, knew or reasonably should have known of Botsford's harassing conduct. The store manager and his assistant worked in the store on a daily basis, week in and week out, and could have been unaware of Botsford's harassing conduct toward the female employees under his supervision only if they ignored the obvious and turned a deaf ear and a blind eye to such actions.

16. Although there was, at times, a joking atmosphere in the produce department which from time to time included sexual comments and jokes, Botsford's harassment of Stewart and other female employees under his supervision went beyond general, good-natured joking.

17. His comments to Stewart were neither welcome nor invited nor responded to by her in kind in a joking manner.

18. Botsford's use of sexually offensive language and directing of offensive conduct toward her was reasonably perceived as abusive by Stewart.

19. His offensive comments caused her to become upset, on occasion to the point of tears.

20. Other employees in the produce department aware of and offended by Botsford's sexual innuendos and harassing remarks included: Kelly Eiswerth, Lil Sease, Terry Miller, and Dale LeVan.

21. Weis employees at the Lycoming Creek store outside of the produce department were also aware of Botsford's sexually harassing conduct.

22. Weis Markets published a part-time employee manual which included a prohibition against sexual harassment in the workplace. The policy described sexual harassment as conduct which includes "unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature such as uninvited touching or sexually related comments."

23. Plaintiff never received a copy of this manual nor had this policy explained to her.

24. Although, at some point, Weis Markets established a hot line for reporting personnel problems in confidentiality and posted a notice concerning the company policy prohibiting harassment, this information was not made known to Stewart prior to her departure from Weis Markets.

25. In August of 1990, the day she was scheduled to leave on a two-week vacation, Stewart reported Botsford's harassment to Botsford's immediate superior, James Shaffer, District Supervisor of Produce.

26. Shaffer oversaw the produce departments of fifteen central Pennsylvania Weis Markets stores.

27. Shaffer was not in the Lycoming Creek store on a day-to-day basis.

28. He visited that store on average once or twice per week.

29. Stewart told Shaffer that she intended to resign because she could no longer tolerate Botsford's sexually harassing comments and conduct.

30. This was the first time that Stewart had spoken to Shaffer about the problem.

31. Shaffer immediately began investigating plaintiff's report of harassment and sought corroboration of her report from Dale LeVan, another employee of the produce department.

32. LeVan confirmed much of what plaintiff had reported to Shaffer about harassment by Botsford.

33. After receiving confirmation from LeVan, Shaffer immediately confronted Botsford, who admitted making the comments which plaintiff had described to Shaffer.

34. Shaffer immediately reprimanded Botsford and told him that the harassment must cease.

35. Botsford received a written reprimand on October 18, 1990, one month after Stewart's departure, for "using language unbecoming to a department head to his employees."

36. No further action was taken against Botsford for his harassment of Stewart and the other females employees of his department.

37. Plaintiff returned from vacation on September 8, 1990.

38. Botsford's sexual harassment of her did, indeed, cease.

39. However, Botsford stepped up criticism of the manner in which plaintiff performed her job.

40. A conflict between plaintiff and Botsford during that period over district-wide changes in the operation of the salad bar implemented while plaintiff was on vacation

and with which she disagreed accounted for some of the criticism.

41. Plaintiff disagreed with the changes implemented, thought them impractical, and expressed her disapproval to Botsford.

42. After returning from vacation September 10, 1990, plaintiff worked only nine days.

43. At the beginning of the work day on Friday, September 21, 1990, Botsford began criticizing plaintiff for her failure to submit a salad bar schedule for the following week as he had previously directed her to do, and to handle certain salad bar scheduling matters in accordance with the new scheduling directives.

44. Plaintiff became angry and upset at what she perceived to be undue harassment or retaliation for her reporting the sexual harassment.

45. Plaintiff announced that she was not going to take any more harassment from Botsford, announced that she was quitting and left the store.

46. She never returned to the store.

47. Immediately after leaving the store, plaintiff telephoned Shaffer and Norman S. Rich, Weis' Director of Store Operations, to report what had happened, and to inform them that she had quit her job because of Botsford.

48. After speaking with plaintiff, Rich contacted Shaffer and directed him to resolve the problem and stated that if the problem was a personality conflict, Shaffer should offer to transfer her to another Williamsport Weis Markets store located on River Avenue, a few miles from the Lycoming Creek Road store.

49. Shaffer telephoned plaintiff the next day and offered her the same position at the same pay and benefits at the River Avenue store.

50. Plaintiff declined the offer of continuing employment at the River Avenue Weis Markets store.

51. She refused to take the position because she had heard negative comments about the produce department manager at the River Avenue store and thought that she would be no better off under his supervision than she had been under Botsford's.

52. Plaintiff did not have any further communications with Weis Markets regarding her possible return to its employ.

53. When she resigned, plaintiff was earning $4.40 per hour and worked approximately 30 hours per week.

54. After leaving the employ of Weis Markets, Stewart diligently searched for other employment, but did not obtain another position until November, 1991 when she was hired as a companion aide at the rate of $5.00 per hour. By the time of trial, her rate of pay had increased to $5.50 per hour.

## DISCUSSION

### Sexual harassment under the PHRA

Plaintiff is seeking compensatory damages for the sexual harassment which she endured while working under Botsford's supervision. Such damages were not available under Title VII prior to the November 21, 1991 effective date of the 1991 Civil Rights Act, the United States Supreme Court ruled in *Landgraf,* —— U.S. at ——, ——, 114 S.Ct. at 1507–08, 128 L.Ed.2d at 245, 265.

Compensatory damages were, however, recoverable for sexual harassment under the PHRA when plaintiff's cause of action arose. As with Title VII, the PHRA prohibits discrimination in employment on the basis of gender. With the exception of the unavailability of compensatory damages for sexual harassment prior to enactment of the 1991 civil rights amendments, case law decided under Title VII is equally applicable to a PHRA claim. *Kryeski v. Schott Glass Technologies,* 426 Pa.Super. 105, 626 A.2d 595, 598 (1993).

In construing Title VII and the PHRA, federal courts and Pennsylvania courts have recognized two forms of sexual harassment: "hostile environment" harassment and "quid pro quo" harassment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49, 58–59 (1986) (Title VII case) and *Kryeski,* 626 A.2d at 598–99.

Stewart has not asserted a cause of action for "quid pro quo" sexual harassment, and is proceeding solely under a "hostile environment" theory.

■ In *Harris v. Forklift Systems, Inc.*, —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court addressed the "hostile work environment" theory of harassment, reaffirming its earlier ruling in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Under those decisions, such harassment is actionable if: it affects a "term, condition, or privilege of employment within the meaning of Title VII," and is so severe or pervasive that it alters the conditions of employment and creates an "abusive working environment". *Id.*, 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60. See also: *Drinkwater v. Union Carbide Corporation*, 904 F.2d 853, 859–860 (3d Cir.1990) (Title VII case).

The "five constituents" which the United States Court of Appeals for the Third Circuit held in *Andrews v. Philadelphia*, 895 F.2d 1469 (3d Cir.1990), "must converge to bring a successful claim for a sexually hostile work environment under Title VII" and, by extension, under the PHRA, were substantially adopted by the United States Supreme Court in *Harris*. See: *Spain v. Gallegos*, 26 F.3d 439, 446 (3d Cir.1994).

■ Under *Andrews* and *Harris*, the claimant must establish that: 1) employees suffered intentional discrimination because of their sex; 2) that the discrimination was pervasive and regular; 3) that the discrimination detrimentally affected the plaintiff; 4) that the discrimination would detrimentally affect a reasonable person of the same sex in that position; and 5) the existence of respondeat superior liability. *Andrews*, 895 F.2d at 1482. These factors are to be reviewed in combination to determine whether the totality of the circumstances indicate the existence of an abusive work environment. *Harris*, —— U.S. at ——, 114 S.Ct. at 370–71, 126 L.Ed.2d at 302.

■ These factors include both a subjective standard and an objective standard. Neither Title VII nor the PHRA is designed to protect the overly sensitive plaintiff. See

*Andrews*, 895 F.2d at 1483. "Title VII does not serve as a vehicle for vindicating the petty slights suffered by the hypersensitive." *Zabkowicz v. West Bend Company*, 589 F.Supp. 780, 784 (E.D.Wis.1984). However, the Supreme Court explained in *Harris*:

But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality. The appalling conduct alleged in *Meritor*, and the reference in that case to environments " 'so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers,' " ... merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.

.... Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, *Meritor* ... 477 U.S., at 67, 106 S.Ct., at 2405, 91 L.Ed.2d, at 59–60 ... there is no need for it also to be psychologically injurious."

*Harris*, —— U.S. at ——————, 114 S.Ct. at 370–71, 126 L.Ed.2d at 302.

Thus, to prevail on her claim that she was subjected to a sexually hostile work environment, Stewart must prove the following by a preponderance of the evidence:

1. That she suffered intentional discrimination because of her gender;

2. That the discrimination was regular and pervasive;

3. That the discrimination detrimentally affected her;

4. That the discrimination would detrimentally affect a reasonable person of the same gender in the same position; and

5. That Weis Markets knew or reasonably should have known that she was subjected to intentional discrimination because of her gender.

*Harris; Andrews,* 895 F.2d at 1482; and *Drinkwater,* 904 F.2d at 860. See also: *Pittman v. Correctional Healthcare Solutions, Inc.,* 868 F.Supp. 105, 108 (E.D.Pa.1994).

### Plaintiff's case

■ The evidence amply demonstrated that Stewart suffered intentional discrimination because of her gender. Sexually-related epithets and insults were directed at her that were not and would not have been directed at a man. Botsford's sexually explicit derogatory language and mannerisms toward Stewart were unwelcome, uninvited, and offensive, subjecting her to a discriminatorily hostile and abusive work environment. *Meritor Savings Bank,* 477 U.S. at 66, 106 S.Ct. at 2405, 91 L.Ed.2d at 59.

■ Further, Botsford's harassment of Stewart was pervasive and regular. See: *Spain,* 26 F.3d at 448 and *Andrews,* 895 F.2d at 1482–1484.[3] Although the occasional off-color remark is insufficient to create a sexually hostile environment, *Drinkwater,* 904 F.2d at 863, much more than that occurred here. Over much of Stewart's employment with Weis Markets, Botsford's comments and conduct were more the norm than not and were of a grossly offensive nature, calculated to harass, belittle and embarrass Stewart. See, e.g. *Karibian v. Columbia University,* 14 F.3d 773 (2d Cir.1994) and *King v. Board of Regents of Univ. of Wis. System,* 898 F.2d 533, 535 (7th Cir.1990). Cf. *Bedford v. Southeastern Pennsylvania Transit Authority,* 867 F.Supp. 288 (E.D.Pa.1994) ("While the conduct alleged by plaintiff is deplorable, it was isolated and certainly not pervasive. Plaintiff points to two incidents several days apart . . .")

The harassing comments and conduct had a detrimental effect on Stewart and would have had the same effect on any reasonable person in her position. In *Harris,* the Supreme Court held that under Title VII conduct can be actionable as harassment creating a sexually hostile work environment, even though it does not affect seriously an employee's well-being or lead the employee to suffer injury.

Stewart testified that she was upset and embarrassed by Botsford's comments, which were of a highly personal and offensive nature. The fact that plaintiff otherwise liked her job and had aspirations of remaining in Weis' employ and perhaps becoming a full-time employer does not detract from the effect that Botsford's conduct and comments had upon her.

■ Sufficient evidence also exists to support a finding of respondeat superior liability. Such liability exists if the defendant "knew or should have known of the harassment and failed to take prompt remedial action." *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989). Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge of the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable. *Katz v. Dole,* 709 F.2d 251, 255 (4th Cir.1983); and *Andrews,* 895 F.2d at 1486. See also *Bouton v. BMW of North America,* 29 F.3d 103, 105–11 (3d Cir.1994). In considering whether an employer's response to a hostile environment claim is "prompt and adequate" courts consider whether the employer investigated the alleged acts of harassment and the type of investigation the employer conducted. *See, Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987) (finding no respondeat superior liability where employer conducted

---

3. The *Andrews* requirement that the discrimination be "pervasive and regular" differs slightly in form from the Supreme Court's statement in *Meritor Savings Bank,* 477 U.S. at 67, 106 S.Ct. at 2405–06, 91 L.Ed.2d at 59–60, that the discrimination be "severe or pervasive." See: *Spain,* at 448. Which of the two formulations is the correct one need not be resolved by this court, since we find that whichever applies, both have been met here.

prompt investigation, by questioning involved employee and interviewing other employees); *Giordano v. William Paterson College,* 804 F.Supp. 637 (D.N.J.1992); *Foster v. Hillside,* 780 F.Supp. 1026, 1039 (D.N.J.1992) *aff'd* 977 F.2d 567 (3d Cir.1992).

During trial, this court held as a matter of law that Botsford did not possess a level of authority sufficient to impute knowledge of his activities to defendant Weis Markets. That ruling required plaintiff to prove that another individual employed by Weis in a supervisory capacity knew or should have known of the harassment, but took no remedial action.

Here, the harassment was sufficiently frequent and done with such disregard for who was in a position to overhear or observe it, that the on-site store management, specifically, the on-site store manager, Dean Meyer, knew or must have known that it was occurring. See: *Andrews* at 1482. Meyer did nothing to halt the harassment or bring Botsford's conduct to the attention of other supervisory personnel.

■ Weis Markets conducted a prompt investigation by questioning plaintiff about her concerns, and by immediately interviewing another employee in the produce department, Dale LeVan. Although to Weis' credit, as soon as the situation was brought to the attention of the district supervisor Shaffer, it was put to an end, his prompt action does not nullify liability for the months that the situation was tolerated by on-site management level employees who knew or should have known that it was occurring. Management level employees cannot turn a deaf ear or a blind eye to situations of obvious harassment. Cf. *Giordano,* 804 F.Supp. at 643, *citing Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989) (finding no respondeat superior liability where employer reprimanded employee in person and assured staff that the harassment would end); *Swentek,* 830 F.2d at 558 (written warning and reprimand following investigation adequate response from employer).

We therefore find, based on a totality of the circumstances, that plaintiff was the object of sexual harassment and intentional discrimination because of her gender. See, *Andrews,* 895 F.2d at 1482.

**The defense**

Defendant asserts that Botsford's remarks were made in jest and were part of a general joking atmosphere in the produce department at the Lycoming Creek store. Although defendant asserts that Botsford addressed sexually-related comments to the males in his department as well, that was not borne out by convincing testimony. The testimony showed that Botsford may have from time to time addressed sexually-related questions to the male employees in his department, but such conduct was not as frequent or as personally offensive as the comments and conduct he directed toward the female members of his department and in particular, Stewart, and was not calculated to have and did not have the same effect, i.e. harassment, intimidation and embarrassment of the females working under his supervision.

**Constructive discharge**

■ Plaintiff's claim of constructive discharge stems from Botsford's alleged nonsexual harassment of her after she reported the sexual harassment to his superior. Plaintiff asserts that Botsford targeted her for unfair criticism out of retaliation for her reporting his misconduct toward her.

■ To establish a constructive discharge claim, the plaintiff must establish that the employer knowingly permitted conditions of discrimination in employment "so intolerable that a reasonable person would be forced to resign." *Levendos v. Stern Entertainment, Inc.,* 860 F.2d 1227, 1232 (3d Cir. 1988) (*Levendos I* ), quoting *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 887 (3d Cir.1984). She must establish more than subjective perceptions of unfairness or harshness or a stress-filled work environment. *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1083 (3d Cir.1992) and *Clowes v. Allegheny Valley Hospital,* 991 F.2d 1159 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 441, 126 L.Ed.2d 374 (1993).

■ Formal notice of the harassment to the employer is not necessarily a requirement for maintaining a case of constructive discharge under Title VII. "[A]lthough no-

tice to executive management is a factor to be considered in a claim of constructive discharge", such notice is not a *sine qua non,* in the face of action on the part of, and notice to, individual supervisory employees or agents which may be imputed to the employer under agency law. *Levendos v. Stern Entertainment, Inc.,* 909 F.2d 747, 751 (3d Cir.1990) (*Levendos II* ).

█ Satisfying these criteria is not an easy task. "Demonstrating constructive discharge requires a showing that 'a reasonable employee would have felt compelled to resign under the circumstances of the case.'" *Darnell v. Target Stores,* 16 F.3d 174, 177 (7th Cir.1994). "To establish a 'constructive discharge,' a plaintiff must show that the employer 'deliberately ma[de his] working conditions so intolerable that [he was] forced into an involuntary resignation.'" *Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360 (2d Cir.1993). See also: *Clowes, supra.* The plaintiff's "working conditions" must "have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987). Employees have an obligation "not to assume the worst, and not to jump to conclusions too fast." Part of the employee's obligation of reasonableness is an obligation to give the employer an opportunity to correct a situation before resigning on the ground that conditions are intolerable.

In *Landgraf v. USI Film Products,* 968 F.2d 427, 430 (5th Cir.1992), *affirmed,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Fifth Circuit stated:

> Moreover, even if the reason for Landgraf's departure was the harassment by Williams, the district court found that, particularly in light of the corrective actions taken by USI immediately before Landgraf resigned, the level of harassment was insufficient to support a finding of constructive discharge. *To prove constructive discharge, the plaintiff must demonstrate a greater severity of pervasiveness of harassment than the minimum required to prove a hostile working environment* .... The harassment here, while substantial, did not rise to the level of severity

necessary for constructive discharge. (Citation omitted.) (Emphasis added.)

The doctrine of constructive discharge was comprehensively reviewed by the Third Circuit in *Gray v. York Newspapers, Inc.,* 957 F.2d 1070 (3d Cir.1992). Anita Gray had been employed as a reporter by *The York Dispatch.* Shortly after the purchase of the Dispatch by *York Newspapers,* Gray was spoken to by the paper's new Metro Editor concerning retirement. On the last day before a scheduled one-month vacation, she was summoned into the Editor's office, offered an early retirement package, and told that he would expect her response upon her return. During her vacation she discussed the matter with her husband, daughters, friends and attorney and decided to accept early retirement.

Thereafter, following the filing of age discrimination charges with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission, Gray instituted an action in this district alleging a violation of the Age Discrimination in Employment Act. She contended that her retirement was involuntary, believing that if she had remained she would have been harassed to the point where she would have had to go on medical leave. Gray contended she had been constructively discharged. York's motion for summary judgment was granted by the district court, which concluded that Gray had retired voluntarily.

On appeal, the Third Circuit affirmed the district court's grant of summary judgment in York's favor. It noted that the doctrine of constructive discharge is the same in all employee discrimination claims and held that she had not been constructively discharged. The Court stated:

> Gray cannot establish a *prima facie* case of age discrimination because she was not discharged from her employment with York but rather voluntarily elected early retirement. Gray maintains that, resolving all factual inferences in her favor, there was ample evidence from which a jury could conclude that a reasonable person in her position would resign under the circumstances. *We employ an objective test in determining whether an employee was*

*constructively discharged from employment:* whether "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." (Citations omitted.) (Emphasis added).

\* \* \* \* \* \*

While all inferences are to be drawn in Gray's favor, we find that no reasonable trier of fact could conclude that Gray had "been harassed and then forced out of a job...." In our view, no inference could reasonably be drawn that Gray would have been unlawfully terminated, or that York "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."

\* \* \* \* \* \*

The evidence demonstrates that Gray deliberated her options carefully, and elected an early retirement package which York had no obligation to offer in the first place. We recognize that Gray probably did perceive that the new management was less affable than that to which she had been accustomed, and we may assume that she *subjectively* (emphasis in original) believed that continued employment would have been uncomfortable and that she would have been demoted or terminated at some point in the future. However, as aptly stated by the Court of Appeals for the Fourth Circuit:

> the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure h[er] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by h[er] co-workers. [Sh]e is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every work-

place grievance, real or imagined, by the simple expedient of quitting.

*Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986).

*Gray,* 957 F.2d at 1078–1083.

*Bristow* also involved a question of constructive discharge. James Bristow worked as a district manager in charge of newspaper distribution. He had recently been reassigned to manage a new district, where he encountered a number of difficulties. He was principally criticized by his superiors over his financial accountability. Believing he was being "ganged up and forced out" because of his age, he decided to resign and thereafter brought suit under the Age Discrimination in Employment Act. Following a jury award, the newspaper's motion for judgment notwithstanding the verdict on the constructive discharge claim was denied.

On appeal, the circuit court reversed, holding that Bristow's resignation arose from a particular financial dispute with his superiors. The Court stated:

> A constructive discharge occurs "when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job."

*Bristow,* 770 F.2d at 1255.

The court held that the constructive discharge standard was not met because no reasonable person would have found the job intolerable, and there was an absence of proof that the employer intended to force Bristow to leave. *See* also *Spangle v. Valley Forge Sewer Authority,* 839 F.2d 171 (3d Cir.1988):

> In order to establish a constructive discharge, the plaintiff must establish that the employer knowingly permitted conditions of discrimination so intolerable that a reasonable person would have felt compelled to resign.

*Id.* at 173.

Plaintiff admitted that Botsford's sexually related conduct ceased immediately after she complained to Botsford's supervisor. The court finds, even assuming Plaintiff was

"closely supervised," that she did not leave her employment because of the alleged sexual harassment. *See, e.g., Benton v. Kroger Co.,* 46 FEP Cases 1356, 640 F.Supp. 1317 (S.D.Texas 1986) (last incident of alleged harassment occurred a month before plaintiff's resignation. No sexual harassment when Plaintiff quits due to subsequent dissatisfaction with working conditions).

Stewart has shown nothing approaching these conditions. Although Botsford's sexual harassment created working conditions intolerable to the average employee of reasonable sensibilities, that harassment ceased with Shaffer's reprimand. Although Stewart charges that Botsford then became abusive toward her in a more general manner, attacking unjustifiably the manner in which she performed her job, the conduct which she described at trial did not rise to the level of intolerable conduct necessary to sustain her claim of constructive discharge.

The Third Circuit has held that a constructive discharge claim based solely on evidence of close supervision of job performance must be "critically examined." *Clowes v. Allegheny Valley Hospital,* 991 F.2d 1159 (3d Cir. 1993). In *Clowes,* the plaintiff claimed constructive discharge because she was "singled ... out for especially close and harsh supervision" by her supervisor. *Id.* at 1160. The Third Circuit found that the employer did not alter plaintiff's job responsibilities or give unsatisfactory performance evaluations, never threatened plaintiff with discharge, did not demote her, reduce her pay or benefits or transfer her to a less desirable position. The court also noted that plaintiff did not request a transfer before resigning. In this scenario, the Third Circuit noted that "unfair and unwarranted treatment is by no means the same as constructive discharge." The Court also held that an employee's subjective perceptions may not govern a claim of constructive discharge. *Id.* at 1162.

Moreover, plaintiff knew by this time that she had an effective avenue of redress for legitimate grievances. Shaffer had immediately come to her aid after confirming her report of abusive conduct on the part of Botsford. She had no reason to believe that he would not be equally responsive in halting Botsford's retaliatory abuse. However, she never gave him that chance. She worked only a few days following her return from vacation. On the ninth day, when challenged by Botsford on her alleged failure to fill out required schedules, she lost her temper and quit. Although losing her temper may have been justified after the months of abuse she had endured because of Botsford, failing to give Weis Markets a fair opportunity to correct the situation was not.

Shaffer acted promptly to redress plaintiff's concerns when plaintiff went to him initially about the sexual harassment she was enduring. She did not, however, give him the same opportunity to respond to and redress her concerns about the non-sexual harassment she believed was being directed against her out of retaliation.

When she did telephone Rich and Shaffer after leaving the store, they did promptly propose a solution to her problem. They offered to transfer her to the produce department at another Williamsport store. Plaintiff rejected that proposal out-of-hand because she had heard negative comments about the produce manager at that store and thought that she would be no better off under his supervision than she had been under Botsford's. After that, she had no further discussions with Weis about returning to its employ.

Plaintiff's concerns about the River Avenue produce manager may have been legitimate, but we will never know. She never gave defendant's proposal a chance.

This is far from establishing that Weis Markets knowingly permitted to exist conditions of discrimination in employment "'so intolerable that a reasonable person would be forced to resign.'" *Levendos I,* 860 F.2d at 1232. We conclude, on that basis, that she has not established the requisite elements of her constructive discharge and find in favor of the defendant on that claim.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over Stewart's Title VII claim (Count I), pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1391.

2. This court has jurisdiction over Stewart's Pennsylvania Human Relations Act claim under its exercise of supplemental jurisdiction, 28 U.S.C. § 1392.

3. Venue in this district is proper, since Stewart was a resident of the Middle District of Pennsylvania when the cause of action arose. She was also employed in this district, and the cause of action arose here. 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1391(c).

4. Stewart was an employee of Weis Markets within the meaning of 42 U.S.C. § 2000e(f) and 43 P.S. § 954(c).

5. Weis Markets was an employer of Stewart within the meaning of 42 U.S.C. § 2000e(b) and 43 P.S. § 954(b).

6. Stewart has satisfied all statutory prerequisites for bringing this action.

7. Stewart's charges with the PHRC were filed within 180 days after the unlawful employment practice occurred.

8. Stewart commenced this action within ninety (90) days of issuance of the "right to sue letter."

9. Dean Meyer was an agent of Weis Markets within the meaning of Title VII. 42 U.S.C. § 2000e(b).

10. James Shaffer was an agent of Weis Markets within the meaning of Title VII. 42 U.S.C. § 2000e(b).

11. Helen Stewart suffered intentional discrimination because of her gender; the discrimination was frequent and pervasive; the discrimination detrimentally affected her; the discrimination would detrimentally affect a reasonable person of the same gender in her position; and supervisory personnel of Weis Markets were aware of and took no action with regard to the sexual discrimination during much of Stewart's employment. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990).

12. Thomas Botsford's sexually explicit derogatory language and mannerisms toward Helen Stewart were unwelcome, uninvited, and offensive. *Burns v. McGregor Electronic Industries, Inc.*, 989 F.2d 959, 962 (8th Cir.1993); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 59 (1986).

13. Thomas Botsford discriminated against Helen Stewart with respect to the terms, conditions and privileges of her employment because of her gender by imposing upon her a discriminatorily hostile and abusive work environment. Botsford was not a supervisory level employee of Weis Markets.

14. The on-site store manager, Dean Meyer, was a supervisory level employee and knew or reasonably should have known of Botsford's sexual harassment of Stewart and other female employees under his supervision.

15. Dale Shaffer, Botsford's immediate supervisor, promptly took corrective action when advised by Stewart of Botsford's harassing conduct toward her by reprimanding Botsford and telling him to cease such conduct.

16. Shaffer's reprimand was effective in that it caused the sexual harassment to cease.

17. Botsford's retaliation against Stewart after he learned that she had reported his conduct did not make the conditions of Stewart's employment so intolerable that a reasonable person subjected to them would have resigned. *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227, 1232 (3d Cir.1988).

18. Shaffer's prompt action after notification of the sexual harassment permits the inference that he would have responded similarly had Stewart brought the non-sexual harassment to his attention before abruptly resigning from her job.

19. Both Shaffer and Rich, another administrative level Weis employee, did just that when advised by plaintiff that she had resigned due to such harassment.

20. At Rich's urging, Shaffer telephoned Stewart and offered her an identical position at the same rate of pay and with the same benefits at another Weis store a few miles from the Lycoming Creek store.

21. Plaintiff did not give Weis Markets a similar opportunity to redress her complaint of non-sexual, retaliatory harassment.

22. While no plaintiff is required to give an employer one opportunity after another to correct a harassment situation, here it was reasonable to expect plaintiff to resort to administrative channels one more time to remedy this new and different type of harassment, particularly when Botsford's supervisor had proven responsive and concerned in the past.

23. Stewart was not constructively discharged from the employ of Weis Markets.

24. Stewart is entitled to recover compensatory damages from Weis Markets under the PHRA for the sexual harassment which she endured due to the conduct and comments of her supervisor, Thomas Botsford.

25. Compensatory damages in the amount of $10,000.00 are awarded to plaintiff under PHRA for the sexual harassment inflicted by Botsford.

26. The evidence was insufficient to justify the imposition of punitive damages.

27. Stewart's claim for back pay is based on her assertion that she was constructively discharged. Because plaintiff did not sustain her burden of proof on this claim, she is not entitled to an award of back pay.

28. Plaintiff is entitled to recover, under section 1988, counsel fees incurred in litigating her claims of discrimination.

29. Plaintiff is also entitled to statutory costs under 28 U.S.C. § 1920.

**Award of attorney's fees**

■■■■ Plaintiff is entitled to recover her counsel fees incurred in bringing this action under Section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k)[4] and the PHRA, 43 Pa.Stat. Ann. § 962(c).[5] Prevailing plaintiffs are presumptively entitled to fee-shifting. *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40, 47–48 (1983) (sec-

4. Section 706(k) provides that in any action under Title VII, "the Court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee (including expert fees) as part of the costs...." 42 U.S.C. § 2000e–5(k) (Supp.1993).

5. Plaintiff's request for attorney fees was dismissed as moot in this court's prior order dated November 28, 1994 and entered to reflect the effect of the United States Supreme Court's holding in *Landgraf v. USI Film Products*, —— U.S.

tion 1983 action).[6] "[F]ee-shifting in favor of a prevailing [civil rights] plaintiff is the rule," not the exception. *Casa Marie Hogar Geriatrico, Inc. v. Rivera–Santos*, 38 F.3d 615, 618 (1st Cir.1994). A plaintiff may be considered a prevailing party for attorney's fees purposes if he or she succeeds "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Farrar v. Hobby*, —— U.S. ——, ——, 113 S.Ct. 566, 572, 121 L.Ed.2d 494, 502 (1992).

**Fee computation**

■■■■ Calculating the amount of counsel fees to be imposed begins with the lodestar, an amount calculated by multiplying the number of hours reasonably expended in defending plaintiff's employment discrimination claims by a reasonable hourly rate. *Hensley*, 461 U.S. at 433–34, 103 S.Ct. at 1939–40, 76 L.Ed.2d 40, 50–51. "Adjustments to that fee then may be made as necessary in the particular case." *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891, 895 (1984). See also: *Keenan v. City of Philadelphia*, 983 F.2d 459, 474–75 (3d Cir.1992). Defendant bears the burden of challenging the reasonableness of the fees requested by plaintiff. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990).

In *Hensley*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the United States Supreme Court listed twelve factors to be considered in calculating a fee award. They are:

1) the time and labor required;

2) the novelty and difficulty of the questions; presented;

3) the skill and knowledge necessary to properly litigate/defend the claims asserted;

——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) on the jury verdict rendered February 16, 1994. The request for fees is now reinstated *nunc pro tunc* consistent with the court's finding that plaintiff prevailed on her claim of sexual harassment.

6. The same standards apply under Title VII as under section 1988. Case law on the two can be cited interchangeably.

4) preclusion of other employment due to acceptance of the case;

5) the customary fee;

6) whether the fee charged is fixed or contingent;

7) time limitations imposed by the client;

8) the amount at stake and the results obtained;

9) the experience, reputation and ability of the attorneys;

10) the "undesirability" of the case;

11) the nature and length of the professional relationship with the client; and

12) awards in similar cases.

■ The proper hourly rate is calculated according to the prevailing market rates in the relevant community. *Blum*, 465 U.S. at 895, 104 S.Ct. at 1547, 79 L.Ed.2d at 899. See also *Black Grievance Committee v. Philadelphia Electric Co.*, 802 F.2d 648, 652 (3d Cir.1986), *vacated on other grounds*, 483 U.S. 1015, 107 S.Ct. 3255, 97 L.Ed.2d 754 (1987). The rates charged should be consistent with "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11, 79 L.Ed.2d at 900 n. 11, as the best measure of the reasonable value of counsel's time, *Black Grievance Committee*, 802 F.2d at 652. Failure to award fees consistent with rates supported by uncontradicted affidavits constitutes reversible error. *Id.* at 653.

■ The most important factor is the "results obtained" by the plaintiff. *Public Interest Research Group of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1185 (3d Cir.1995). In determining the final fee, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940, 76 L.Ed.2d at 50–51.

■ The plaintiff is not entitled to fees incurred in investigating or litigating claims on which he or she did not prevail at trial. In reducing the award for time spent on issues on which the plaintiff was not successful or obtained only partial success, the district court has the option of determining the number of hours devoted to such issues and subtracting them from the total hours compensable, *or* of reducing the award by a certain percentage gauged to reflect fairly plaintiff's less than complete success. Which is more appropriate is within the court's discretion. *Hensley*, 461 U.S. at 436–37, 103 S.Ct. at 1941, 76 L.Ed.2d at 52–53. Under Third Circuit precedent, this calculation can be based on whether and to what extent the successful and unsuccessful claims "share a 'common core of facts' or, conversely, are based on related legal theories. If the plaintiff does not prevail on a claim which is distinct in all respects from the claims on which she prevailed, time spent on that claim should be excluded from the fee award. *West Virginia University Hospitals, Inc. v. Casey*, 898 F.2d 357, 361 (3d Cir.1990). See also: *Rode*, 892 F.2d at 1183 and *Black Grievance Committee*, 802 F.2d at 656. Cf. *Public Interest Research Group of New Jersey*, 51 F.3d at 1190 ("A simple, mechanistic reduction based solely on the ratio of successful to unsuccessful issues is ... precluded by *Hensley* .... [T]he district court ... is required to do a more searching analysis than it did here before it can apply a negative multiplier.")

### Stewart's fee petition

Stewart seeks attorneys fees and expenses totalling $34,347.30 (record document no. 95). In support of that request, counsel has submitted affidavits and billing statements reflecting the number of hours spent on this case, the services performed, and the hourly rate charged.

According to plaintiff's fee petition and the attached documents: 1) four attorneys worked on this case: Michael J. Zicolello, Esq., Barbara Turotsy, Esq., Robert A. Seiferth, Esq. and Mary Catherine Schemery, Esq.; 2) Zicolello worked a total of 148.9 hours for a total fee of $18,612.50; 3) Turotsy worked a total of 104.9 hours for a total fee of $7,592.50; 4) Seiferth worked a total of 6.7 hours for a total fee of $1,072.00; 4) Schemery worked a total of 1.2 hours for a total fee of $150.00; 5) Judy A. Berkheiser, a litigation paralegal and Michelle A. Ayers, a law librarian, also worked on the case; 6) Berk-

heiser worked a total of .9 hours for a total fee of $45.00; 7) Ayers worked a total of .2 hours for a total fee of $11.00; 8) total fees incurred up to the point of filing of plaintiff's fee petition were $28,483.00; 9) total expenses incurred up to that point were $1,987.70; 10) Turotsy's normal hourly rate during the period she performed work on this case was $65.00; 11) Berkheiser's normal hourly rate during the period she performed work on this case was $50.00; 12) all individuals who worked on this case were employed by the law firm of Liebert, Short and Hirshland when the case was filed; 13) while the case was pending, that firm dissolved, and all attorneys formerly associated with the Williamsport office of that firm joined the firm of Marshall, Dennehey, Warner, Coleman and Goggin; 14) normal billing rates for attorneys employed by the Marshall Dennehey firm vary from client to client and it is its practice, due to the uncertainty of receiving payment in contingent fee cases and the delay in receiving payment, to bill counsel's time expended on such cases at the highest hourly rate charged by that attorney; 15) Attorney Zicolello's highest rate is $125.00 per hour; 16) Attorney Turotsy's highest rate is $125.00 per hour; 17) Attorney Seiferth's highest rate is $160.00 per hour; 18) Attorney Schemery's highest rate is $125.00 per hour; 19) Stewart entered into a fee agreement with the Liebert, Short firm pursuant to which she agreed to pay a one-third contingent fee to counsel if she prevailed; 20) additional fees and expenses, totaling, respectively $1,062.50 and $99.75 were incurred for services performed by Attorney Zicolello in preparing plaintiff's fee petition; 21) fees and costs incurred up to the point of filing plaintiff's fee petition totalled $29,545.50 and $2,087.45, respectively, which together total $31,632.95. (Record document no. 85)

The above breakdown does not reflect fees incurred subsequent to the filing of plaintiff's original fee petition (record document no. 85). Plaintiff's fee was updated with a supplemental petition filed June 13, 1994 to reflect further fees incurred in the amount of $2,714.35. (Record document no. 96, plaintiff's exhibits to supplemental fee petition.)

Although additional work was undoubtedly performed after the filing of the supplemental petition, as evidenced by filings with the court, no further supplemental petition has been filed. Our calculations reflect the fact that additional fees were undoubtedly incurred after the filing of the supplemental petition. Based on the work previously done by counsel on this case, the post-petition filings submitted to the court and the rates charged on the invoices submitted, we have a fair sense of what additional charges would reasonably have been incurred in making the additional filings. The percentage reductions made below would have been slightly greater had there not been additional work performed not reflected in the petition and supplemental petition filed. Our calculations also reflect the fact that we have not separately calculated or awarded prejudgment interest on the fee award.

Plaintiff's fee petition was accompanied by an affidavit from Attorney Zicolello attesting to: 1) his legal experience and educational background and that of the other members of his firm who worked on this case; 2) firm billing practices; and 3) the accuracy of computer billing records supplied to the court. Also attached to plaintiff's fee petition are affidavits from other local attorneys attesting to: 1) the reasonableness of the fees charged by plaintiff's counsel for the services provided—or stating that the fees charged are consistent with their own fees for comparable services; 2) their practice of increasing hourly fees charged in contingent fee cases; 3) their reluctance to take on employment discrimination or civil rights cases due to the uncertainty of receiving payment and the time expenditure required. (Record document no. 85, exhibits.)

Defendant opposes the grant of plaintiff's fee request on three grounds. It argues that: 1) plaintiff's counsel has not provided the court with their usual hourly rate, making it impossible for the court to determine the lodestar figure; 2) plaintiff's counsel is not entitled to the contingent fee multiplier requested; and 3) plaintiff did not prevail on all claims for which fees are sought, i.e. she did not prevail at the administrative level,

nor did she prevail on her claim for the intentional infliction of emotional distress.

### Calculation of fee award

■ Our starting point is calculation of the lodestar. Plaintiff's fee petition was accompanied by statements which set forth in detail the time spent on this matter, the dates work was performed, the nature of the work performed, etc. (See: record document no. 85, exhibits). The number of hours expended on this matter is very reasonable in the view of the nature of the case, the quality of the representation afforded and the result obtained. The "relevant market" for determining the reasonableness of the fees sought is Williamsport, Pennsylvania. Plaintiff has supplied the court with numerous affidavits from counsel in this case and other attorneys attesting to the reasonableness of the fees sought. From that information, we can determine, contrary to defendant's assertions, the reasonable value of counsel's services in this area for the work performed.

■ The difficulty which we have with the hourly rates quoted is the inclusion of a contingent fee multiplier. Stewart's counsel seeks to recover fees calculated at the "highest rate offered" by counsel who worked on the case. Plaintiff's justification for use of this rate is the alleged reluctance of other attorneys in this area to represent civil rights/employment discrimination plaintiffs because of the uncertainty of recovery and the expertise and expenditure of time such cases require. Although plaintiff does not use the term multiplier, that is what the request for calculation of the lodestar amount at the "highest rate offered" is. We, therefore, judge it under the same criteria applied to requests for multipliers on contingent fee and other grounds. In general, multipliers are available "only in 'rare' cases of "exceptional success." *Blum,* 465 U.S. at 889, 104 S.Ct. at 1544, 79 L.Ed.2d at 896.

Although the United States Supreme Court has yet to address the appropriateness of a contingency multiplier in the civil rights or employment discrimination context, it has twice rejected use of a multiplier under federal environmental fee-shifting statutes. In *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), the Court rejected use of a multiplier "or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss" under fee shifting provisions of the Clean Air Act (CAA), 42 U.S.C. § 7604(d), but did not definitively resolve the appropriateness of the use of contingency multipliers under federal fee-shifting statutes. A few years later, in *City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the Court did definitely resolve the issue, holding that for the reasons stated previously in Justice White's opinion in *Delaware Valley,* 483 U.S. at 715–727, 107 S.Ct. at 3081–3088, 97 L.Ed.2d at 591–599, "enhancement for contingency is not permitted under the fee-shifting statutes" of the Solid Waste Disposal Act (SWDA), 42 U.S.C. § 6972(e) or the Federal Water Pollution Control Act (CWA) 33 U.S.C. § 1365(d). The Court's holding in *Burlington* has since been applied to fee requests made in employment discrimination cases, civil rights cases and other cases to which federal fee-shifting statutes apply. See, e.g., *Davis v. Mutual Life Insurance Company of New York,* 6 F.3d 367 (6th Cir. 1993) (Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c), case); *Drennan v. General Motors Corp.,* 977 F.2d 246, 253 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2416, 124 L.Ed.2d 639 (1993) (extending City of Burlington to enhancement of fees awarded under ERISA, 29 U.S.C. § 1132(g)(1)); *Wolfel v. Morris,* 972 F.2d 712, 720 (6th Cir.1992) (reversing, on basis of *City of Burlington,* fee enhancement awarded under 42 U.S.C. § 1988); *Stewart v. Gates,* 987 F.2d 1450, 1453 (9th Cir.1993) (section 1988 fee petition). *Dutton v. Johnson County Board of County Commissioners,* 1995 WL 337588 at *4 (D.Kan. May 26, 1995) (Americans with Disabilities Act of 1990 (ADA) case, 42 U.S.C. § 12101 et seq.— multiplier not warranted because counsel took the case on a contingent fee basis); and *Brewer v. Protexall, Inc.,* 1994 WL 782900 at *1 (C.D.Ill. Aug. 8, 1994) (ERISA case).

The Supreme Court, in fact, noted in *Burlington,* that the CWA "language is similar to

that of many other federal fee-shifting statutes," and that its "case law construing what is a 'reasonable' fee applies uniformly to all of them." *Burlington,* 505 U.S. at 562, 112 S.Ct. at 2641, 120 L.Ed.2d at 456.

On the basis of *Burlington,* and its progeny, we conclude that plaintiff is not entitled under federal law to the contingent multiplier sought. Less clear is whether she would be entitled to such a multiplier under the PHRA. Although the award of fees is clearly authorized by section 962(c.2), which provides that "if after a trial ... the court of common pleas finds that a defendant engaged in or is engaging in any unlawful discriminatory practice as defined in this act, the court may award attorney fees and costs to the prevailing plaintiff." 43 Pa.Stat.Ann. § 962(c.1). Scant authority exists, however, on how such an award is to be calculated and what may be included. There appears to be no authority from the Pennsylvania courts either condoning or disapproving the use of a contingent fee multiplier. Cf. *Jones v. Muir,* 511 Pa. 535, 515 A.2d 855 (1986) (Larsen dissent) (endorsing lower court's use of a contingent fee multiplier). In the absence of guidance from the Pennsylvania courts, we look to the general premise that Title VII and the PHRA serve the same purpose, and are, if reasonable, to be construed *in pari materia.* In light of that, we conclude that if this issue were to come before it, the Pennsylvania Supreme Court would conclude for much the same reasons as were stated in by the United States Supreme Court in *Burlington,* that use of a multiplier is not appropriate in this context.

To reflect that determination and bring the fees calculated at the "highest rate offered" into line with standard rates, we will reduce the total fees requested by ten percent. Our review of the attachments to plaintiff's fee petition and supplemental petition convinces us that reduction of the rates by ten percent brings them into line with the rates customarily charged by the attorneys and paralegals in this area with abilities and experience similar to plaintiff's counsel.

■ We also have to consider how much the fees should be reduced to reflect the fact that plaintiff did not prevail on her claims for intentional infliction of emotional distress or on her claim of constructive discharge or on the claims asserted against Thomas Botsford. For the most part, all claims asserted arose out of the same facts. Each was based on Botsford's harassment of Stewart in the workplace and the responsiveness or non-responsiveness of Weis Markets to the complaints to remedy the same. See, e.g., *West Virginia University,* (Title VII and section 1983 claims are "related claims" for fee calculation purposes, since they share a "common core of facts"). Plaintiff prevailed on some, but not others, because of the differing proof requirements. The total fees sought will be reduced by an additional ten percent to reflect her limited success.

For all of these reasons, we have determined that plaintiff is entitled to 80% of the total fees requested as reasonable compensation for attorneys' fees and expenses incurred in litigating this matter to a successful conclusion, and she will be awarded for those purposes the sum of $27,477.84.

\* \* \* \* \* \*

An order will issue consistent with this memorandum.

### *ORDER*

For the reasons set forth in the accompanying opinion, **IT IS ORDERED THAT:**

1. The court finds in favor of plaintiff, Helen Stewart, and against defendant, Weis Markets, Inc. on her claim of being subjected to a sexually hostile work environment.

2. The court finds in favor of defendant, Weis Markets, and against plaintiff, Helen Stewart, on her claim of constructive discharge.

3. The court awards plaintiff compensatory damages under the PHRA for her claim of being subjected to a sexually hostile work environment in the sum of $10,000.00.

4. Plaintiff's petition for attorneys' fees incurred in litigating this matter is granted (record document nos. 85 and 95) and plaintiff is awarded attorneys' fees and costs in the sum of $27,447.84.

5. Final judgment is entered in favor of plaintiff Helen Stewart and against defendant Weis Markets, Inc. in the aggregate sum of $37,477.84.

6. The clerk is directed to close the file.