James B. BRISTOW, Appellee,

v.

The DAILY PRESS, INC., Appellant.

James B. BRISTOW, Appellant,

v.

The DAILY PRESS, INC., Appellee.

Nos. 84–2021(L), 84–2039.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1985.

Decided Aug. 22, 1985.

DiMuro, Charles M. Rust-Tierney, Hirschkop & Grad, P.C., Alexandria, Va., on brief), for appellant/cross-appellee.

Frederick E. Popovitch, Point Pleasant, N.J. (William H. McKinnon, Popovitch & Popovitch, Point Pleasant, N.J., on brief), for appellee/cross-appellant.

Before RUSSELL and WILKINSON, Circuit Judges, and KNAPP, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.

WILKINSON, Circuit Judge:

This appeal presents a question of constructive discharge in the law of employment discrimination. Plaintiff James B. Bristow brought suit against his former employer, The Daily Press, Inc., under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 (1982) *et seq.*, complaining that he had been denied promotions and forced to resign because of his age. The case was tried before a jury, which found for the employer on the promotion denial claims, and for Bristow on the constructive discharge claim, awarding plaintiff $99,000 in damages for lost wages and $50,000 in liquidated damages. Judgment was entered accordingly, the district court also allowing attorney's fees of $8,825 and costs of $1,500 for plaintiff. Defendant's motion for judgment n.o.v. on the constructive discharge claim was denied.

We reverse. While we are mindful of the deference due a jury verdict, after reviewing the evidence we are convinced that defendant's motion for judgment n.o.v. should have been granted. Plaintiff demonstrated little more than job dissatisfaction which will not support a constructive discharge claim.

John P. Connors, Washington, D.C. (William J. Butler, Jr., Hanson, O'Brien, Birney & Butler, Washington, D.C., Bernard J.

I

Bristow worked as a district manager for The Daily Press, Inc. from 1965 until his resignation in September 1981 at the age of

64.[1] A district manager oversees carriers that distribute newspapers to customers and collects the bills when due. On October 15, 1980, Bristow was assigned to manage District 25, located in the city of Hampton, Virginia. This was an unusually large district, some 27 miles in circumference, containing a cross-section of customers, from the prominent to the poor. It included two low income areas. Bristow had 57 carriers under his supervision, 55 of whom handled home delivery, while two had motor routes. He collected about $2,000 per week. Above Bristow in authority were John Goodwyn, the circulation director; Daniel Cruey, the assistant circulation director; and Jean Burdick, the division manager who was Bristow's immediate supervisor. Goodwyn and Bristow, as both testified, had a "very good" relationship.

Cruey told Bristow, upon placing him in charge of District 25, that this would be his "final assignment." Previously Bristow had been a "swing man," a substitute district manager assigned to various districts as needed. Bristow, however, suspected that management also wanted him "out" because he was too old, and that he was being sent to a district with unique problems. Bristow did encounter a number of difficulties in managing District 25, including poor collections in the two low income areas, turnover of carriers on certain routes, fluctuating costs for the rural motor routes, and lack of financial documentation. Burdick helped him less than he desired.

None of the evidence offered, however, indicated that District 25's problems were in any way unique. Nelson Salway, a witness for plaintiff and his predecessor as manager of District 25, had experienced similar difficulties with collections, carrier turnover, motor routes and circulation overruns, but did not regard them as unusual. He observed that there "were problems with every district," compounded in District 25 simply due to its greater size. All district managers, according to Salway, confronted difficulties of the same nature. Other witnesses familiar with the tasks of a district manager corroborated Salway's description. Robert Grey, Bristow's successor in District 25 and another witness called by plaintiff, described the problems in District 25 as "minor" and attributed them to improper management, believing that greater cooperation between Burdick and Bristow was needed. District 25, he asserted, was not a "problem" district but simply very large. Grey considered the district as "basically in pretty good shape," remarking that "[a]nybody that really had any knowledge of circulation work could have gone in and made the changes that I did." William Rogers, a manager of another district, recognized that all districts had problems like those in District 25. Bristow himself acknowledged that his troubles in District 25 diminished after he had been in charge for three to four weeks. By then he felt that he was "accomplishing something," having managed to "stabilize" his territory.

Bristow was principally criticized by superiors over his financial accountability. Circulation overruns arose when carriers failed to notify the company of how many newspapers they needed; this was a familiar problem, and as Salway remarked, "everyone complained about that." The company held its district managers responsible when carriers did not pay their outstanding accounts, though Bristow believed that he was not responsible for the carriers' circulation problems. Bristow admitted that he also co-mingled company and

---

**1.** Bristow's personnel records, introduced into evidence by plaintiff, showed that he was born on April 17, 1917. Consistent with this, his complaint alleged that he was 61 when the first promotion denial claim arose in February 1979, and Bristow testified that he was 66 when this case was tried on April 4–6, 1984. The district court's assumption, in ruling on defendant's post-trial motions, that Bristow was 62 years of age when he left defendant's employ, lacks evidentiary support.

personal funds, but regarded the company at fault for not giving him sufficient change to handle collections.

Bristow's district was audited on August 1, 1981, and he was blamed for several outstanding accounts. He learned from Burdick on September 5 that there was "talk" of forcing him into "early retirement."[2] On September 9, Bristow was called to a meeting with Goodwyn, Cruey and Burdick, and presented with a list of uncollected accounts totaling $561.34. Although Bristow's job performance was discussed by his superiors, no one threatened to fire him, nor did he offer to resign. Cruey proposed, rather, that Bristow pay half of the outstanding accounts, while the company would write off the remainder. Bristow accepted this arrangement, and shortly thereafter paid the company $281.17, believing it necessary to avoid being fired. He still did not consider himself responsible for the carriers' mistakes.

No evidence indicated that the employer would have taken any further action against Bristow. Both Bristow and Burdick had contended, in the course of the meeting, that the district was too large for one person to handle efficiently. Cruey noted this point in his record of the discussion. Goodwyn, summarizing the outcome in a September 9 memorandum, did not fault Bristow, but instead criticized Burdick's supervision of District 25. Nevertheless, following the meeting Bristow concluded that he was being "ganged up on and forced out" because of his age, and he decided to resign.[3] He presented a letter to Goodwyn and to William Van Buren, president of The Daily Press, on September 10, stating that he was resigning for "personal" reasons, effective at the end of the month. According to Bristow, Goodwyn asked, "Is this necessary?," and Bristow rejoined, "Yes, I think it is."

Later, on September 16, Bristow approached Goodwyn and Van Buren in an unsuccessful attempt to rescind his resignation. In discussions after Bristow submitted his retirement request, Burdick encouraged him not to reconsider in light of his age. Bristow once again spoke to Goodwyn on September 21, but now was concerned only that he would lose some retirement benefits because he was retiring before age 65. Goodwyn contacted Van Buren about the matter, and on September 30, Van Buren notified Bristow that his retirement benefits would be supplemented by an additional $15.03 per month, so as to put him in the same position as if he had retired normally. Bristow's retirement became effective on October 1, 1981.

## II

◼ An employee must have been discharged to state an ADEA claim arising from loss of his job. 29 U.S.C. § 623(a)(1). The law affords no protection from discrimination unless there has been some adverse employment action by the employer. Because Bristow was not actually discharged, he relies here on a theory of constructive discharge. This claim is not supported by the evidence. The fact that problems and tensions are encountered on the job does not suffice to establish constructive discharge. Here those problems were part and parcel of what one would expect in a position in newspaper circulation and bill collection.

---

**2.** Cruey sent a memorandum to Goodwyn on September 2 describing Bristow as a "liability" to the company due to his failure to carry out his responsibilities and his lack of organization, and suggesting Bristow's termination.

**3.** Bristow had no other discussions with Goodwyn or Cruey before submitting his resignation. After the meeting, however, he spoke to Burdick, who told him "that Mr. Cruey had called her in there to fire her—fire me. Had called me to the meeting to fire me." Bristow observed that Burdick "was right upset about it." Though Bristow may have interpreted Burdick's statement as referring to himself, it is obvious that the threat was directed at Burdick, both in light of her condition and Goodwyn's criticisms; indeed, it appears that Bristow's testimony was quoting Burdick's actual complaint verbatim.

A constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) (Title VII), *quoting J.P. Stevens & Co., Inc. v. NLRB,* 461 F.2d 490, 494 (4th Cir.1972) (labor). *Accord, Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983); *Clark v. Marsh,* 665 F.2d 1168, 1173 (D.C. Cir.1981); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981); *Young v. Southwestern Savings & Loan Assn.,* 509 F.2d 140, 144 (5th Cir.1975); *Muller v. United States Steel Corp.,* 509 F.2d 923, 929 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions.

Deliberateness exists only if the actions complained of "were intended by the employer as an effort to force the employee to quit." *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 672 (4th Cir.1983), *rev'd on other grounds,* —— U.S. ——, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). "To act deliberately, of course, requires intent." *Holsey,* 743 F.2d at 209. Our decisions require proof of the employer's specific intent to force an employee to leave, *J.P. Stevens & Co., Inc. v. NLRB,* 461 F.2d 490, 494 (4th Cir.1972). Intent may be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions, as we stated in *Holsey,* 743 F.2d at 209. Where, however, all employees are treated identically, no particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign. *Johnson,* 646 F.2d at 1256.

Intolerability of working conditions, as the circuits uniformly recognize, is assessed by the objective standard of whether a "reasonable person" in the employee's position would have felt compelled to resign. *Goss,* 747 F.2d at 888; *Pena,* 702 F.2d at 325; *Clark,* 665 F.2d at 1173; *Johnson,* 646 F.2d at 1256; *Bourque,* 617 F.2d at 65; *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977). "An employee may not be unreasonably sensitive to his working environment." *Johnson,* 646 F.2d at 1256. Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

Even construing the evidence in the light most favorable to the nonmoving party, as we are required to do in reviewing a jury verdict on a motion for judgment n.o.v., *Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 891 (4th Cir.1980), the constructive discharge test was not satisfied here. For judgment n.o.v. to be denied, there had to exist "substantial evidence" upon which a jury could reasonably return a verdict for Bristow. *Wyatt,* 623 F.2d at 891. We are convinced that such evidence is lacking.

At most, Bristow demonstrated that he experienced problems in managing District 25, which may have been somewhat greater than those of other managers due to the comparatively large size of his territory. No reasonable person would have found the job intolerable. District 25 offered no obstacles unique in the newspaper circula-

tion business; other managers were well acquainted with unpaid bills, circulation overruns and carrier turnover. If District 25 called for more effort from its managers because of its extent and demographics, the demands it posed were hardly unbearable for an employee of Bristow's considerable experience. Bristow's successor did not find District 25 beyond the capacity of a manager familiar with circulation work. Nor did Bristow find the general problems arising in his district to be insoluble; indeed, after he had worked in his new position for a month, they actually diminished, as might be expected. Finally, Bristow's desire for reinstatement to his position belies the claim that intolerable conditions underlay his resignation.

 It is obvious that Bristow's resignation arose from a particular financial dispute with his supervisors, and that at no time did anyone impose intolerable working conditions with the intent to compel him to retire.[4] Deliberate behavior on the part of his employer to force Bristow off the job is not in evidence. While some of Bristow's superiors spoke of early retirement or were even urging his termination, nothing was done to Bristow that would lead a reasonable person to quit. The compromise offered to Bristow, whereby he paid half of the uncollected accounts in his district, was hardly unjust, for plaintiff presented no evidence that any other district managers had been allowed to escape liability when entangled in similar controversies. Whether or not the employer's rules of financial accountability be thought harsh, Bristow was not singled out for any unique treatment. Having to pay a portion of the accounts, for which Bristow did not consider himself responsible, may have marked the culmination of many minor dissatisfactions in the case of this employee. We cannot, however, conclude that he resigned due to anything other than universal workaday frustrations.[5]

### III

We need not resolve any other issues raised on this appeal. Because plaintiff was not constructively discharged, but voluntarily resigned, no adverse employment action has occurred. Consequently, no ADEA suit can be maintained against defendant. The judgment for plaintiff is reversed.

REVERSED.

---

**4.** Plaintiff's history of alleged promotion denials preceding his resignation contributes nothing to his claim of constructive discharge. Whatever denials he may have experienced entailed no age discrimination, as the jury's verdict established. Any residual embarrassment he may have felt is of no consequence, for "[t]hat occurs any time an employee is not promoted." *Federal Reserve Bank,* 698 F.2d at 672. A failure to promote is insufficient in itself to result in a constructive discharge. *Id.*

**5.** Though after a week's time Bristow reconsidered his precipitate act, his employer was under no duty of any kind to rehire him, and was entitled in the circumstances to consider his resignation final.