Chester BULKOSKI, Plaintiff,

v.

BACHARACH, INC., Defendant.

No. Civ.A. 95–1390.

United States District Court, W.D. Pennsylvania.

March 21, 1997.

Colleen E. Ramage, Trushel Law Group, Pittsburgh, PA, for Plaintiff.

Margaret F. Houston, Houston Harbaugh, Pittsburgh, PA, for Defendant.

## MEMORANDUM

STANDISH, District Judge.

### I

In this civil action, plaintiff, Chester Bulkoski, asserts claims against defendant, Bacharach, Inc., under the Age Discrimination in Employment Act (the ADEA), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act (the PHRA), 43 P.S. § 951 *et seq.*, arising out of the termination of his employment with defendant on April 15, 1993.[1] Presently, before the court is the motion of defendant for summary judgment pursuant to Fed.R.Civ.P. 56. After consideration, and for the reasons set forth below, the motion will be granted.

### II

For purposes of the present motion, the following facts are undisputed:

Plaintiff was born on May 11, 1946. He was initially hired by defendant as a maintenance helper in October, 1964. In 1977, plaintiff was promoted to the position of Area Supervisor in defendant's Heavy Assembly Division. In this position, plaintiff's responsibilities included supervising employees, organizing work orders, assembling work stands for diesel engines, troubleshooting and testing products and preparing products for shipment. (Brief in Support of Plaintiff's Response, p. 2, Bulkoski Depo., pp. 5, 10).

In May, 1992, due to a decrease in the workload of the Heavy Assembly Division, plaintiff was transferred to defendant's Light Assembly Division, and, between May, 1992 and November, 1992, plaintiff's time at work was divided between the Light Assembly Division and the Methods Division. When plaintiff was transferred to the Light Assembly Division in May, 1992, James Beck, defendant's Production Superintendent, became plaintiff's immediate supervisor. (Brief in Support of Plaintiff's Response, pp. 3–4).

In early November, 1992, plaintiff was assigned to work full time in defendant's Light Assembly Division. (Brief in Support of Plaintiff's Response, Beck Depo., p. 25). On November 19, 1992, Mr. Beck completed a written evaluation of plaintiff's performance as an Area Supervisor in the Light Assembly Division. In the categories of "Technical Competence" and "Communicating," plaintiff received "Satisfactory" ratings, and in the categories of "Planning/organizing," "Supervising/Leading" and "Work Commitment," he received "Below Satisfactory" ratings.[2] Overall, plaintiff received a "Below Satisfactory" rating. The comments to the performance evaluation state that plaintiff would be monitored for the next six months for progress; that he would receive a special review in six months; and that he would be downgraded from Area Supervisor to Supervisor effective December 1, 1992. (Brief in Support, Exh. B). Shortly thereafter, plaintiff

---

1. In his complaint, plaintiff also asserted claims against defendant under the ADEA and the PHRA based on his demotion by defendant in December, 1992. (Complaint, ¶¶ 6–13). However, during his deposition, plaintiff testified that his claims against defendant in this case arise out of the termination of his employment in April, 1993, and that he is not asserting any claims against defendant based on his demotion in December, 1992. When plaintiff was demoted from Area Supervisor to Supervisor in December, 1992, the demotion involved a change in title only. Plaintiff's wages, benefits and job duties remained the same. Moreover, he was not replaced by a younger employee outside the protected age group under the ADEA. (Defendant's Brief in Support, Exh. A, pp. 115–121).

2. The possible ratings on the evaluation form are "Outstanding," "Excellent," "Good," "Satisfactory" and "Below Satisfactory."

met with Mr. Beck, Bernard Dombrosky, defendant's Vice President of Industrial and Public Relations, and Edward Startari, defendant's Senior Vice President of Operations, to discuss the performance evaluation. (Brief in Support of Plaintiff's Response, pp. 12–13).

In January, 1993, Mr. Beck met with plaintiff to discuss his progress in connection with the deficiencies raised in the November, 1992 performance evaluation. At that time, Mr. Beck believed that plaintiff was progressing "somewhat," and he indicated that he would rate plaintiff's overall performance at that time as "Satisfactory." (Brief in Support of Plaintiff's Response, Beck Depo., pp. 108–109).

In late March, 1993, prior to the expiration of the six-month monitoring period mentioned in the comments to plaintiff's performance evaluation, Mr. Dombrosky met with plaintiff to inform him that he was being removed from his position as Supervisor in the Light Assembly Division due to his performance. At that time, Mr. Dombrosky presented plaintiff with two options that would have enabled plaintiff to continue his employment with defendant.[3] Specifically, plaintiff was offered the position of Storeroom Supervisor or the position as Second Shift Supervisor in the Light Assembly Division. (Brief in Support, Exh. A, pp. 89–90; Brief in Support of Plaintiff's Response, Dombrosky Depo., pp. 18, 34–35). If plaintiff decided not to accept either of these positions, his remaining option was to terminate his employment with defendant. (Brief in Support, Exh. A, pp. 90–91).

During the last week of March, 1993, after considering his options, plaintiff decided to terminate his employment with defendant, rather than accept either of the positions offered by Mr. Dombrosky. Plaintiff's last day of employment with defendant was April 15, 1993. (Brief in Support, Exh. A, pp. 93–95). At that time, plaintiff was 46 years old. Mark Panaro replaced plaintiff as the Supervisor of defendant's Light Assembly Division. Mr. Panaro was 34 years old. (Brief in Support of Plaintiff's Response, p. 15).

With respect to the position of storeroom Supervisor, plaintiff did not choose this option because Mr. Dombrosky's offer regarding this position was "to try it for 30 days," which plaintiff interpreted as meaning that he would be terminated after 30 days, and because plaintiff believed that defendant had already hired John Ziemansky for this position.[4] As to the position of Second Shift Supervisor in the Light Assembly Division, plaintiff did not choose this position because his pay would be "greatly reduced,"[5] and

---

**3.** With respect to Mr. Dombrosky's action of removing plaintiff from his position as Supervisor in defendant's Light Assembly Division before the expiration of the six-month monitoring period, in a supplemental affidavit filed in support of defendant's motion for summary judgment, Mr. Dombrosky states that he was informed of plaintiff's performance problems in the Light Assembly Division in November, 1992; that, thereafter, he monitored plaintiff's progress in that position; that it became apparent to him that plaintiff was not succeeding as a supervisor in the Light Assembly Division; and that, as a result, he purposely allowed a vacancy in the position of Storeroom Supervisor to continue based on his belief that it was a suitable position for plaintiff. (Supp.Aff. of Dombrosky, ¶ 5).

**4.** Mr. Ziemansky began his employment with defendant as the Storeroom Supervisor on April 14, 1993. Although Mr. Ziemansky's commencement of employment began one day before the last day of plaintiff's employment with defendant, it was several weeks after plaintiff had informed Mr. Dombrosky that he had decided to terminate his employment with defendant. (Brief in Support of Plaintiff's Response, Dombrosky Depo., p.

29, Startari Depo., p. 29). In this connection, in his supplemental affidavit filed in support of defendant's summary judgment motion, Mr. Dombrosky states that, with the exception of intra departmental transfers, he is responsible for all offers of jobs to new hires and existing employees of defendant, and that the Storeroom Supervisor position was not filled and, had not been promised to any one at the time he offered the position to plaintiff in March, 1993. (Supp.Aff. of Dombrosky, ¶¶ 3 and 6).

**5.** There is a dispute as to whether plaintiff's pay would have been reduced if he had accepted the position of Second Shift Supervisor in the Light Assembly Division. Plaintiff testified that Mr. Dombrosky told him that he would "probably" earn $4.75 per hour in this position or whatever the gentleman was making who was then supervising the second shift. (Brief in Support, Exh. A, p. 91). On the other hand, in the supplemental affidavit filed in support of defendant's summary judgment motion, Mr. Dombrosky states that plaintiff would not have suffered a decrease in pay or a demotion if he had accepted either of the offers extended to him in March, 1993. (Supp.Aff. of Dombrosky, ¶ 4).

because it did not make sense to him to accept a position involving the same work as the position from which he was being removed due to poor performance. (Brief in Support, Exh. A, pp. 90–96).

## III

Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 273 (1986). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986). While the facts must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* 477 U.S. at 248–50, 106 S.Ct. at 2510–11. Keeping this standard in mind, the court turns to defendant's motion for summary judgment.

## IV

■ To establish a *prima facie* case of age discrimination, plaintiff must demonstrate by a preponderance of the evidence (1) that he belongs to the protected class; (2) that he was qualified for the position; (3) that he was dismissed despite being qualified; and (4) that he was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination. *See, e.g., Billet v. CIGNA Corp.*, 940 F.2d 812, 816 n. 3 (3d Cir. 1991). In the present case, there is no dispute that plaintiff has established the first and fourth elements of his *prima facie* case, and, for purposes of its summary judgment motion, defendant does not contest the second element. (Brief in Support, p. 8). However, defendant asserts that it is entitled to a judgment in its favor as a matter of law because plaintiff cannot establish the third element of his *prima facie* case—that he was discharged.[6] After consideration, the court agrees.

■ The issue of constructive discharge was addressed by the United States Court of Appeals for the Third Circuit in *Gray v. York Newspapers, Inc.*, 957 F.2d 1070 (3d Cir. 1992). In *Gray*, several employees brought an age discrimination action against their former employer. The district court granted summary judgment against the employees, and they appealed. With respect to appellant Gray, the Third Circuit stated:

\*    \*    \*    \*    \*    \*

Gray cannot establish a *prima case* of age discrimination because she was not discharged from her employment with York but rather voluntarily elected early retirement. Gray maintains that, resolving all factual inferences in her favor, there was ample evidence from which a jury could conclude that a reasonable person in

---

**6.** After the argument on defendant's motion for summary judgment, plaintiff's counsel wrote a letter to the court dated January 7, 1997 in which counsel attempted to expand on the adverse employment action being challenged in this case. A review of plaintiff's complaint, deposition testimony and pretrial narrative statement reveals that plaintiff's claims against defendant in this case are limited to the termination of his employment. Nevertheless, in her letter, counsel argued that the challenged adverse employment action in this case should be expanded to include the unfavorable performance evaluation given to plaintiff in November, 1992, as well as the "special" probationary status imposed upon plaintiff as a result of that evaluation. In

response, defense counsel wrote to the court on January 24, 1997, asserting that defendant would be severely prejudiced if plaintiff were allowed to change his theory of the case at this late date because discovery has been completed and a summary judgment motion has been filed and argued. Assuming, *arguendo*, that plaintiff's unfavorable performance evaluation and his "special" probationary status could be considered adverse employment actions under the ADEA, the court agrees with defense counsel that it is too late for plaintiff to change his theory of the case. Therefore, the adverse employment action being challenged in this case is limited to the termination of plaintiff's employment with defendant.

her position would resign under the circumstances. *We employ an objective test in determining whether an employee was constructively discharged from employment: whether "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign."* (citations omitted). (emphasis added).

\* \* \* \* \* \*

Gray contends that her decision to retire was her only practical choice since she: (1) had witnessed Harris Sacks forced out of his job by the new management; (2) knew that Linda Roeder had been harassed by the new management to the point where she had to take medical leave; (3) felt isolated by being offered a "secret retirement" option; (4) had been told that she was going to be removed from her longtime courthouse beat after she had told her new boss how much she enjoyed that work; and (5) felt that Graham lied to her regarding the reasons he permitted her to continue in the courthouse beat after being told that she would be reassigned.

\* \* \* \* \* \*

While all inferences are to be drawn in Gray's favor, we find that no reasonable trier of fact could conclude that Gray had "been harassed and then forced out of a job. . . ." In our view, no inference could reasonably be drawn that Gray would have been unlawfully terminated, or that York "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss*, 747 F.2d at 888. . . .

\* \* \* \* \* \*

The evidence demonstrates that Gray deliberated her options carefully, and elected an early retirement package which York had no obligation to offer in the first place. We recognize that Gray probably did perceive that the new management was less affable than that to which she had been accustomed, and we may assume that she *subjectively* believed that continued employment would have been uncomfortable and that she would have been demoted or terminated at some point in the future. However, as aptly stated by the Court of Appeals for the Fourth Circuit:

> the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure h[er] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by h[er] co-workers. [Sh]e is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

*Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986).

957 F.2d at 1079–1083.

■ Similarly, in the present case, the court concludes that no reasonable jury could conclude that plaintiff had been forced out of a job by defendant. First, plaintiff has failed to identify any "conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Gray, supra.* Clearly, any claim by plaintiff of overzealous supervision would not qualify as an intolerable condition warranting a finding of constructive discharge in this case. *See Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1162 (3d Cir.), *cert. denied*, 510 U.S. 964, 114 S.Ct. 441, 126 L.Ed.2d 374 (1993). Second, it is undisputed that plaintiff was offered two different supervisory positions by Mr. Dombrosky to enable him to continue his employment with defendant. Plaintiff's failure to accept either of the positions was based on his subjective perceptions of the jobs, which, as the case law makes clear, is impermissible.

With respect to plaintiff's belief that he would be terminated after 30 days in the

position of Storeroom Supervisor, he admitted that Mr. Dombrosky never told him that the duration of the job was so limited. Specifically, during his deposition, plaintiff testified as follows:

\* \* \* \* \* \*

Q. You're telling me your interpretation of what Mr. Dombrosky said when he was offering you the storeroom supervisor position was he really meant he was going to terminate you.

A. Yes, because he was very specific on, Why don't you try it for 30 days? Very specific, 30 days.

Q. What do you think "try it" meant?

A. Go back there, because we need you for 30 more days, and then we're going to terminate you.

Q. But he never said it?

A. No.

Q. That was your interpretation?

A. It was implied by me.

Q. By the words, "Why don't you try it for 30 days?"

A. Uh-huh.

\* \* \* \* \* \*

(Brief in Support, Exh. A, p. 96).

As to plaintiff's belief that the position of Storeroom Supervisor had already been filled by John Ziemansky, plaintiff did not ask Mr. Dombrosky, or any other management level employee, if this was the case, and, as noted by defendant, he completely fails to take into account defendant's ability to transfer him into the Storeroom Supervisor position even if someone was holding the position at the time it was offered to plaintiff. (Defendant's Reply Brief, p. 6). Turning to the offer of the position of Second Shift Supervisor in the Light Assembly Division, plaintiff failed to adequately explore the rate of pay that he would receive in this position or how the responsibilities of the Second Shift Supervisor may have differed from his position as the Supervisor of the first shift. He merely assumed that his pay would be "greatly reduced," even though he testified that Mr. Dombrosky did not know the rate of pay for this position, and he concluded on his own that it made no sense to accept a position

involving the same work as the position from which he was being removed due to poor performance.

In summary, employees have an obligation "not to assume the worst, and not to jump to conclusions too fast." *Stewart v. Weis Markets, Inc.*, 890 F.Supp. 382, 392 (M.D.Pa. 1995). A reasonable employee will usually explore alternative avenues thoroughly before coming to the conclusion that resignation is the only option. *Clowes*, 991 F.2d at 1161. Because the undisputed evidence shows that plaintiff voluntarily terminated his employment with defendant without thoroughly exploring the alternative avenues offered by Mr. Dombrosky and that he was not constructively discharged, there is no adverse employment action upon which he can base a claim for age discrimination.

Accordingly, defendant is entitled to a judgment in its favor as a matter of law.