# CIRCUIT COURT OF SUSSEX COUNTY

William A. Epperson

v.

Virginia Department
of Corrections

December 9, 2008

Case No. CL08-36

By Judge W. Allan Sharrett

This memorandum opinion is in response to Plaintiff William A. Epperson's request that the Court find that he involuntary resigned from his employment at the Department of Corrections ("DOC"), and therefore is entitled to a grievance hearing under Va. Code § 2.2-3004(E) (2008). For the reasons that follow, the Court does not find that Plaintiff involuntarily resigned and, therefore, denies him a grievance hearing.

## I. *Summary of the Facts*[1]

Epperson served as Watch Commander at Sussex I State Prison, as an employee of the DOC. On January 19, 2006, he received an e-mail originating from Captain Darrel L. Miller, his superior, with a subject line of "Go Michigan!" The e-mail contained pornographic material. Epperson reported the incident to the Chief of Security, Major Ivan T. Gilmore, the same day, but never received a response. Later in the spring, Epperson heard from other staff members that Captain Miller was telling others that Epperson had reported

---

[1] The Court's analysis of whether Epperson's resignation was involuntary is limited to the facts contained in the grievance record.

him for distributing the pornographic e-mail. Captain Miller supposedly said that he was "going to get" Epperson and that Epperson may have cost him a promotion.

Between January 19, 2006, and April 22, 2006, Epperson served as Watch Commander on the night shift. On April 22, 2006, Epperson learned that Captain Miller was demoting him to Assistant Watch Commander. Lieutenant M. Carwile, who had a history of being out sick for months at a time, replaced Epperson. That same day, Epperson spoke with Warden Loretta K. Kelly. He advised her of his concerns that Captain Miller had demoted him out of retaliation and that he was in a hostile work environment. The following day, he summarized their conversation in an e-mail to Warden Kelly. Apparently, she took no action.

On April 27, 2006, Epperson filed a grievance against Captain Miller. Epperson claimed that Captain Miller demoted him in retaliation for Epperson's reporting of Captain Miller for sending the pornographic e-mail. Epperson delivered the grievance to Tammy Craft, Human Resource Officer. She discussed the issue with Epperson, telling him that she did not believe Captain Miller demoted him in retaliation and suggesting that Epperson discuss the incident with Warden Kelly. Craft returned the grievance to Epperson.

On April 28, 2006, Epperson spoke with Warden Kelly again, and she, too, said that she did not believe that Captain Miller demoted him in retaliation. Warden Kelly suggested that Epperson discuss the matter with Captain Miller. Later that same day, Epperson sent an e-mail to Captain Miller, requesting a meeting to discuss the issue and apologizing for how uncomfortable their relationship had become. Epperson admitted that he believed the gossip of other staff – that is, that Captain Miller had told them that he was "going to get" Epperson for reporting him and for costing him a promotion and that the reason for Captain Miller's demoting Epperson was his report of Captain Miller's pornographic e-mail. Epperson wrote that he had spoken with Warden Kelly and no longer believed that any of the gossip was true. He apologized (presumably for his distrust of Captain Miller and for the grievance he attempted to file with Craft), asked for forgiveness, and requested a meeting with him. On May 1, 2006, Captain Miller responded via e-mail by simply writing "noted."

On July 13, 2006, Epperson received a Notice of Potential Standards of Conduct Violation for failure to follow institutional procedure concerning the videotaping of entrance of an inmate's cell and for displaying poor decision-making in dealing with an inmate medical emergency. The notice stated that he was "being referred for possible disciplinary action." A hearing with

Warden Kelly was scheduled for July 17, 2006. The incident referred to in the notice occurred July 3, 2006. Epperson entered an inmate's cell to check on a non-responsive inmate who was completely covered by a sheet. The prison had a policy that all cell entries made with the intent to use force against the inmate or to extract the inmate must be videotaped. The policy's purpose is to prevent prisoner abuse. During the disciplinary hearing on July 17, 2006, Warden Kelly accused Epperson of entering the inmate's cell without a video camera to assault the inmate. She stated that she did not see any reason for Epperson's entry of the cell. Epperson maintained that he entered the cell for emergency health reasons, not to abuse the inmate, and that videotaping was not necessary or appropriate under the circumstances. He advised Warden Kelly that, had he not entered the cell and had the inmate died, then Epperson would have lost his job. Warden Kelly disregarded the inmate's statement that Epperson did nothing wrong to him. She stated that the next time Epperson entered a cell without a video camera, he would be terminated. Epperson also advised Warden Kelly that no policy existed that required the use of a video camera when entering a cell to check on the inmate's well-being. Warden Kelly responded that such a policy did exist and promised to produce it, but never did. Epperson claims that this is another example of retaliation against him.

On July 15 and 22, 2006, Epperson complained to Warden Kelly and others via e-mail that he had been working alone in the watch office and that this was unfair because the other three shifts had two to three supervisors working in the watch office. Prior to this date, Warden Kelly had stated in a supervisors' meeting that she never wanted to come to the prison at night again and learn that another lieutenant was working alone in the watch office. After Epperson's complaints, he was reassigned from the watch office to Housing Unit 2 on September 12, 2006.

On September 1, 2006, Epperson called the prison from the hospital to report that he was having chest pains and would not be in to work. As required, he notified the prison within two hours of his scheduled shift start time. He spoke with a displeased assistant warden, who told him that he could not force him to come to work due to his condition. On September 5, 2006, Epperson submitted his medical documentation to Captain Miller.

On September 20, 2006, Warden Kelly sent an e-mail to Epperson, stating that he was scheduled for a hearing on September 22, 2006, "for possible disciplinary actions" regarding his failure "to report to work as scheduled and the appearance of a pattern of not reporting as it relates to shift and/or post assignments." Epperson responded via e-mail, requesting that he be given the dates that he failed to report to work as scheduled and the dates of any counseling he received concerning the issue. He did not receive a response.

On September 21, 2006, Epperson reported to work; however, he was stressed and unfocused because of a belief that he was being harassed by the administration. Feeling unable to perform his duties, he advised another administrator of his condition and asked to be relieved from work that day. That administrator told Epperson to discuss it with Warden Kelly. Epperson called Warden Kelly to inform her of his unfitness for duty, and she became very confrontational, allegedly stating that, if he did not want to be at work, then he should just leave and it would support her case. As a result, Epperson did not leave.

On September 22, 2006, at 8:30 a.m., Warden Kelly held a meeting for all supervisors in which she announced that a group of sergeants and lieutenants "were trying to get rid of her but they will be gone first." At Epperson's disciplinary hearing later that same day, Warden Kelly informed Epperson that, because of his failure to report to work on September 1, 2006, he was scheduled for a disciplinary hearing on September 26, 2006, for abandonment of shift and breach of security. Epperson maintains that this action was taken against him in retaliation for earlier behavior, as he complied with prison policy in reporting his absence on September 1, 2006.

In addition, all of Epperson's work profiles and quarterly evaluations had been very good prior to the incident with Captain Miller on January 19, 2006. After that date, no further evaluations of Epperson's work performance were conducted, despite that prison policy required that he should have received three quarterly evaluations prior to his resignation.

On September 22, 2006, Epperson sent his resignation via e-mail to Craft. He wrote the following: "I Lt. Epperson feel that I have been harassed and retaliated against by the administration here at Sussex I State Prison and therefore I resign my position immediately." That same day, Warden Kelly received a printed copy of the e-mail, on which she indicated that she approved the resignation. She wrote, and signed her signature to, the following: "Ineligible for rehire, resigned in lieu of attending disciplinary hearing."

On or about October 18, 2006, Epperson filed a grievance with the Commonwealth of Virginia, of which the DOC is an agency, in accordance with Virginia's Employee Grievance Procedure. In response, the DOC claimed that Epperson did not have access to the grievance procedure because he voluntarily resigned his position and thus was not a state employee at the time the grievance was initiated. Virginia's Department of Employment Dispute Resolution ("EDR") considered the issue and concluded, through its January 24, 2007, Access Ruling of Director, that Epperson did have access to the grievance procedure because of the

possibility that his resignation could be deemed involuntary. Because this is a factual determination, the EDR did not evaluate the merits of the claim and remanded the grievance to the DOC.

On February 9, 2007, the DOC determined at the first resolution step that Epperson's resignation was voluntary, and therefore he was not entitled to a grievance hearing. Epperson received this notification on February 15, 2007, and indicated that he wished to advance his grievance to the second step. Sometime later, a Second Step Grievance Response was issued.[2] Warden Kelly stated therein that there was no evidence to support Epperson's allegation that Captain Miller was harassing him. In addition, she wrote that Epperson's decision to resign was made solely by him and that no resignation was requested or discussed with him at any time.

Additional facts surrounding Epperson's employment came to light in this Second Step Grievance Response ("the Response"). According to the Response, on September 22, 2006, Warden Kelly reviewed the events of September 1, 2006, with Epperson. During the hearing, Epperson stated that he called in sick that day due to chest pains. He spoke to an assistant warden, who told him he needed to bring in documentation of his illness the next time he came to work. At 5:30 p.m., Epperson went to the hospital, and the doctor told him he should stay out of work. However, Warden Kelly played a voice-mail at the September 22, 2006, hearing from 12:30 p.m. on September 1, 2006, in which Epperson stated he was not coming to work that night because his doctor had taken him out of work for two days. There was no way for Epperson to know that the doctor had advised him not to go to work if he had not yet seen a doctor. His failure to report to work that day left thirty-eight officers unsupervised on a night with severe weather conditions. Two other employees who were scheduled to go home had to remain at work until another employee, who was scheduled to be off, came to work in the middle of a storm to relieve them, because they had exceeded the maximum hours they could work in a twenty-four hour period by law. According to the Response, Warden Kelly told Epperson on September 22, 2006, that a formal hearing would be scheduled for a later date to handle this matter, at which time Epperson left her office, only to resign later that day. Human resource policy states that employees who resign while disciplinary action is pending are ineligible for rehire. Furthermore, human resource policy states that employees who fail to give two weeks notice of resignation without mitigating

---

[2] This document is undated and does not state the author; however, the Court assumes it was Warden Kelly.

circumstances may be denied future employment. In light of these facts, Warden Kelly concluded in the Response that Epperson used poor judgment in resigning and fabricated allegations in an attempt to justify his actions and to be reinstated.

On March 10, 2008, the Director of the EDR in her Compliance and Qualification Ruling determined that Epperson voluntarily resigned and thus was not entitled to a grievance hearing. Epperson filed his appeal with this Court, pursuant to Va. Code § 2.2-3004(E) (2008). The Court must decide whether Epperson's resignation was involuntary. If it concludes that it was an involuntary resignation, then Epperson is entitled to a grievance hearing through the EDR.

## II. *Discussion*

The Supreme Court of Virginia has not adopted a test for determining whether a resignation was involuntary. However, the Fourth Circuit Court of Appeals test in *Bristow v. Daily Press, Inc.*, 770 F.2d 1251 (4th Cir. 1985), has been applied in several other circuit courts across Virginia. This Court adopts the *Bristow* test as well.[3]

An involuntary resignation, also known as a constructive discharge,[4] "occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.' A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." *Id.* at 1255 (citations omitted).

The first prong is the intolerability of the working conditions. "Intolerability of working conditions . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Id.* The test is purely objective. "An employee may not

---

[3] The DOC argues that the Court should apply the test in *Stone v. University of Maryland Medical Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1989), which is less favorable to a grievant seeking to prove that his resignation was involuntary. However, as Plaintiff points out on brief, *Stone* involved a plaintiff seeking redress for an alleged violation of his Fifth and Fourteenth Amendment rights – specifically, Stone sought a determination that his employer's activity was so egregious that he was deprived of a property interest in violation of the Constitution. *Stone* is a different type of case from the instant matter and will not be applied.

[4] "Involuntary resignation and constructive discharge are equivalent terms." *Dennison v. County of Frederick*, 726 F. Supp. 137, 140 (W.D. Va. 1989) (citation omitted).

be unreasonably sensitive to his working environment. Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Id.* (citations omitted). In addition, the *Bristow* court recognized that all jobs have their frustrations, and the government cannot ensure total satisfaction at work:

> Every job has its frustrations, challenges, and disappointments; they inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.

*Id.*

Courts must be wary of potential abuse of the grievance process by employees who resign, then assert involuntary resignation claims. *See Jones v. Prof'l Hospitality Res., Inc.*, 35 Va. Cir. 458, 462 (Va. Beach 1995) (citing *Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir. 1989)). "It follows that, unless a Plaintiff presents facts demonstrating severe and pervasive conditions creating an intolerable work environment, a court should find that the [intolerability of the working conditions] prong of the constructive discharge claim is not satisfied." *Id.*

In the instant case, in evaluating the intolerability of the working conditions, it is apparent that a reasonable person would not have felt compelled to resign under the circumstances that Epperson met. Epperson was demoted, and his previous position of Watch Commander was given to another officer who was frequently out sick for extended periods of time. At best, this is a frustrating and disappointing condition of employment. Epperson was not guaranteed he would retain his position, and the DOC had the right to give it to someone else at any time.

In addition, Plaintiff faced, at best, challenging work conditions in July 2006, when he had to work the Watch Office alone; however, after he complained, he was switched to Housing Unit 2. The record makes no mention that this was a demotion, was a less desirable job, or also involved working with insufficient staff. The Court infers that this was a beneficial move.

Likewise, Epperson faced, at best, difficult work conditions when Warden Kelly brought disciplinary charges against him in July 2006. She accused him of entering the inmate's cell without a video camera to assault the inmate and threatened that, if he entered a cell without videotaping it again,

then he would be terminated. In addition, Warden Kelly did not produce a policy that required officers to videotape cell entry for emergency medical treatment purposes. However, the record is devoid of proof of punishment for this infraction, even if the charge was pursued unfairly. Epperson retained his job and no unreasonable conditions or requirements were imposed. This incident may have led Plaintiff to feel that he was not trusted by his employer and may have led to some extra work; however, the condition was not intolerable.

In September 2006, Epperson again faced possible disciplinary action due to his absence from work on September 1, 2006. Even if the facts surrounding the reasons for his absence and his reporting that he would miss work due to medical reasons are considered in the light most favorable to Plaintiff, a reasonable person still would not have felt compelled to resign under the circumstances. On September 22, 2006, Warden Kelly discussed the events of September 1, 2006, with Epperson and informed him that a formal disciplinary hearing would be scheduled for a later date. At that time, he still faced only possible, not certain, disciplinary action. He would have had an opportunity to explain and defend himself; however, he chose instead to voluntary resign, opting not to face the pending disciplinary hearing. Epperson's decision to resign, albeit made when he was no doubt emotional due to Warden Kelly's confrontation, was his own voluntary decision, competently made, in the face of an investigation of his misconduct. *See Abdo v. O'Neill*, 47 Va. Cir. 307, 308 (Fairfax Co. 1998).

Plaintiff's own subjective perceptions led to his resignation. He felt that he was being retaliated against for reporting Captain Miller's misconduct of sending a pornographic e-mail. However, the record does not prove any such retaliation. In fact, Epperson admits that he fell victim to believing staff gossip and apologized to Captain Miller for damaging their relationship. Epperson was unreasonably sensitive to his working environment and voluntarily chose to resign rather than deal with the stressors of the job. Such stressors would not have compelled a reasonable person to resign.

The second prong is the deliberateness of the employer's action. "Deliberateness exists only if the actions complained of 'were intended by the employer as an effort to force the employee to quit'." *Bristow*, 770 F.2d at 1255 (citations omitted). To prove deliberateness, a grievant must show intent. "To act deliberately, of course, requires intent. Our decisions require proof of the employer's specific intent to force an employee to leave." *Id*. (citations omitted). Direct and/or circumstantial evidence may be used to demonstrate the specific intent. "Intent may be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions. . . .

Where, however, all employees are treated identically, no particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign." *Id.*

Having found that the intolerable working conditions prong of the *Bristow* test is not met, it is not necessary to evaluate Epperson's case under the second prong – that is, the deliberateness of the employer's action.

## III. *Conclusion*

The record does not show that Plaintiff's working conditions were intolerable; therefore, Plaintiff voluntarily resigned from his position, and he is not entitled to a grievance hearing.

The decision of the Director of the EDR is affirmed, and Plaintiff's grievance appeal is denied. It is so ordered.